IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 01-11040
_____

PERSONAL SECURITY & SAFETY SYSTEMS INC.; RICHARD R. JAFFE,

Plaintiffs-Appellees,

versus

MOTOROLA INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____
July 1, 2002

Before JOLLY, JONES, and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Motorola, Inc. appeals the district court's denial of its
motion to compel arbitration of claims raised by Personal Security
and Safety Systems, Inc. ("PSSI"). In 2000, PSSI filed suit
against Motorola alleging that Motorola breached a stock purchase
agreement with PSSI and made fraudulent misrepresentations during
the negotiations leading up to the agreement. Although the stock
purchase agreement did not include an arbitration clause, Motorola
moved to compel arbitration based on a provision in a licensing
agreement that was executed alongside the stock purchase agreement
as part of a broader contractual arrangement. The district court

initially granted Motorola's motion, but it later reconsidered its decision and denied the motion.

The central issue in this appeal is whether PSSI's claims under the stock purchase agreement fall within the scope of the broad arbitration provision in the licensing agreement. We hold that the licensing agreement's arbitration provision governs claims arising out of the stock purchase agreement because the agreements were executed together as part of the same overall transaction and therefore are properly construed together. We further hold that a forum selection clause in the stock purchase agreement does not operate to preclude arbitration of claims arising out of that agreement. Accordingly, we reverse the district court's denial of Motorola's motion to compel arbitration and remand to the district court for entry of an order staying the litigation and requiring the parties to submit their dispute to binding arbitration.

I

The underlying dispute in this case stems from Motorola's abortive strategic investment in PSSI. Before its demise in 1999, PSSI was a small start-up company engaged in the development and sale of specialized security systems -- primarily a "Personal 911 System" that allowed individuals to summon help from within a limited geographic area by means of a wireless communications device. Although it had made substantial progress in developing the technology for the Personal 911 System by 1997, PSSI did not

2

have sufficient capital to complete development of the system or to install the system at customer sites. At about the same time, Motorola was in the process of developing a similar localized security system for use in the hospitality industry, but its technology was significantly less developed than PSSI's technology.

Seeing an opportunity for collaboration, Motorola initiated discussions with PSSI in June 1997 concerning a possible investment in PSSI that would give Motorola access to PSSI's technology. On December 17, 1997, PSSI and Motorola executed three agreements in connection with this investment: a Stock Purchase Agreement, a Product Development and License Agreement, and a Shareholders Agreement. Each of these agreements played a particular role in the overall transaction.

Under the Stock Purchase Agreement, Motorola agreed to provide twelve million dollars in financing in return for a convertible debenture and a nine percent equity stake in PSSI. The financing was to come in three parts. First, Motorola paid PSSI one million dollars in cash and forgave a one million dollar interim loan that it had provided to PSSI during the negotiations. Second, Motorola loaned PSSI five million dollars to finance the development of the existing Personal 911 System. Third, Motorola agreed to provide up to five million dollars to finance the installation of the existing Personal 911 System at customer sites once PSSI secured purchase contracts for the system.

Under the Product Development Agreement, the parties agreed to collaborate on the development of new communications technologies based on the existing PSSI system. The Product Development Agreement also defines in detail the parties' respective rights to existing intellectual property and to any new, jointly-developed intellectual property. The Shareholders Agreement, which is not directly at issue in this litigation, defines shareholder rights.

In May 1999, PSSI completed development of its Personal 911 System, and several customers committed to purchase the system. Relying on the terms of the Stock Purchase Agreement, PSSI asked Motorola to provide it with financing to install the system at the customer sites. When Motorola refused to disburse the requested funds, PSSI filed a complaint in federal district court alleging that (1) Motorola's refusal to provide financing constituted a breach of the Stock Purchase Agreement and (2) Motorola made fraudulent representations during negotiations to induce PSSI to enter into the agreement. Invoking the arbitration provision in the Product Development Agreement, Motorola filed a motion to stay the proceedings and to compel arbitration.[1] The district court ultimately denied Motorola's motion, and Motorola now appeals

---

[1] In its initial complaint, PSSI also alleged that Motorola fraudulently inserted a provision into the Product Development Agreement. After Motorola filed its motion to compel arbitration, however, PSSI filed an amended complaint that omitted all claims relating to the Product Development Agreement. The claims in PSSI's amended complaint thus rely exclusively on the Stock Purchase Agreement, which does not contain an arbitration clause.

4

pursuant to 9 U.S.C. § 16.[2] The proceedings in the district court have been stayed pending the appeal.

## II

The primary issue in this appeal is whether the arbitration provision in the Product Development Agreement applies to PSSI's claims arising under the Stock Purchase Agreement. Motorola argues that PSSI's claims fall within the broad scope of the arbitration provision because the Stock Purchase Agreement and the Product Development Agreement were executed together as part of the same transaction and therefore must be construed together. PSSI responds that the two agreements are independent, freestanding contracts. Because PSSI's claims rely solely on the Stock Purchase Agreement and because the arbitration provision in the Product Development Agreement does not expressly apply to claims arising under other agreements, PSSI maintains that the arbitration provision does not reach claims under the Stock Purchase Agreement. Instead, PSSI argues that the forum selection clause in the Stock Purchase Agreement controls, and the claims stated in its complaint must be litigated in a court located in Texas.

The district court agreed with PSSI and denied Motorola's motion to compel arbitration. We review de novo the district court's denial of a motion to compel arbitration. See OPE Int'l LP

---

[2] The district court initially granted Motorola's motion, but later reversed itself upon PSSI's motion for reconsideration.

5

v. Chet Morrison Contractors, Inc., 258 F.3d 443, 445 (5th Cir. 2001).

A

We begin our inquiry by outlining the basic principles that inform federal law in this area. The Supreme Court has made it clear that the Federal Arbitration Act, 9 U.S.C. § 3, establishes a "liberal policy favoring arbitration" and a "strong federal policy in favor of enforcing arbitration agreements." Texaco Exploration and Prod. Co. v. AmClyde Engineered Prod. Co., Inc., 243 F.3d 906, 909 (5th Cir. 2001) (citations and internal quotation marks omitted). Of course, this general policy is not without limits. Because arbitration is necessarily a matter of contract, courts may require a party to submit a dispute to arbitration only if the party has expressly agreed to do so. See AT&T Tech., Inc. v. Communications Workers of Am., 475 U.S. 643, 648 (1986); see also Volt Info. Sciences, Inc. v. Bd. of Trustees, 489 U.S. 468, 478 (1989) ("[The FAA] simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms.").

To ascertain whether the parties have agreed to arbitrate a particular claim, we must determine: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." OPE Int'l, 258 F.3d at 445 (citations and internal

6

quotation marks omitted). In view of the policy favoring arbitration, we ordinarily "resolve doubts concerning the scope of coverage of an arbitration clause in favor of arbitration." Neal v. Hardee's Food Systems, Inc., 918 F.2d 34, 37 (5th Cir. 1990); see also Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983) (same). As a consequence, a valid agreement to arbitrate applies "unless it can be said with positive assurance that [the] arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." Neal, 918 F.2d at 37 (internal citations and quotation marks omitted). With these principles in mind, we now turn to the arbitration provision in this case.

B

Motorola and PSSI agree that the Product Development Agreement contains a valid arbitration provision and that there are no external constraints that preclude arbitration of PSSI's claims. Thus, the central question is whether the arbitration provision covers the claims -- arising solely out of the Stock Purchase Agreement -- alleged in PSSI's amended complaint. Stated in terms of the applicable caselaw, the question is whether we can say "with positive assurance" that the arbitration provision in the Product Development Agreement is not susceptible of an interpretation that would cover those claims.

7

We start, as always, with the language of the arbitration provision itself. Paragraph 14.2 of the Product Development Agreement provides, in relevant part:

> [T]he parties hereby agree to resolve by binding arbitration any and all claims, demands, actions, disputes, controversies, damages, losses, liabilities, judgments, payments of interest, penalties, enforcement of settlement agreements, deficiencies, any and all demands not yet matured into the foregoing, and other matters in question arising out of or relating to this Agreement (all of which are referred to as "Claims"), even though some or all of such Claims allegedly are extra-contractual in nature and even though some or all of such Claims sound in contract, tort or otherwise, at law or in equity, in accordance with Commercial Arbitration Rules . . . of the American Arbitration Association . . . .

Where, as here, an arbitration provision purports to cover all disputes "related to" or "connected with" the agreement, we have held that the provision is "not limited to claims that literally 'arise under the contract,' but rather embrace[s] all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute." Pennzoil Exploration and Production Co. v. Ramco Energy Ltd., 139 F.3d 1061, 1067 (5th Cir. 1998). Thus, PSSI must arbitrate its dispute with Motorola if the allegations of fraud and breach of the Stock Purchase Agreement have a "significant relationship to" the subject matter of the transaction.

PSSI argues that the arbitration provision does not apply in this case because it governs only those claims related to the Product Development Agreement, while the claims stated in PSSI's complaint arise under an entirely separate agreement. It is well established, however, that "[u]nder general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together." Neal v. Hardee's Food Systems, Inc., 918 F.2d 34, 37 (5th Cir. 1990) (citations omitted); see also Restatement (Second) of Contracts § 202(2) (1979) (same); Richland Plantation Co. v. Justiss-Mears Oil Co., Inc., 671 F.2d 154, 156 (5th Cir. 1982) ("When several documents represent one agreement, all must be construed together in an attempt to discern the intent of the parties, reconciling apparently conflicting provisions and attempting to give effect to all of them, if possible." (citations omitted)).

In the present case, the Stock Purchase Agreement and the Product Development Agreement were both key elements of a transaction in which Motorola agreed to provide financing in return for a stake in PSSI and access to PSSI's technology. Although the Stock Purchase Agreement and the Product Development Agreement govern different facets of the parties' relationship, the agreements must be construed together because they were executed at

the same time as part of the same overall transaction.[3] Indeed, each agreement expressly anticipates the execution of the other,[4] and the parties attached a form of the Product Development Agreement as an exhibit to the Stock Purchase Agreement. As we observed in Neal, 918 F.2d at 37, "[a]lthough the parties used multiple agreements to delineate their relationship, each agreement was dependent upon the entire transaction. . . . The individual agreements were integral and interrelated parts of the one deal."

PSSI argues that this view runs contrary to the intent of the parties in this case because the arbitration provision was in an ancillary agreement and was therefore not intended to govern the parties' entire relationship.[5] Even assuming that the Stock

---

[3] Paragraph 1.1 of the Stock Purchase Agreement provides that "each and every event . . . that is to occur at the Purchase Closing [including the execution of the Product Development Agreement] shall be deemed to have occurred contemporaneously."

[4] The Stock Purchase Agreement provides that "[i]n connection with the Purchase and Loan, [Motorola] and [PSSI] desire to enter into certain other agreements, upon the terms and subject to the conditions set forth herein." The Stock Purchase Agreement expressly refers to the Product Development Agreement as one of those agreements. The Product Development Agreement similarly provides that "the parties have executed or will execute between them various agreements in connection with an investment by Motorola in PSSI (the 'Related Agreements')."

[5] As further evidence that the two agreements were intended to be construed separately, PSSI notes that each agreement selects a different governing law. In particular, the Product Development Agreement provides that Illinois law governs its interpretation while Texas law governs the interpretation of the Stock Purchase Agreement. Although this potential conflict in governing law may have to be resolved during the course of arbitration, such a conflict is not conclusive evidence of the parties' intent, and it does not affect our interpretation of the scope of the arbitration

10

Purchase Agreement is the heart of the transaction at issue here, however, this fact is not dispositive because the arbitration provision is contained in an agreement that was essential to the overall transaction.[6]

As we explained earlier, the thrust of the transaction was relatively straightforward. In return for providing funds to complete the development and installation of PSSI's Personal 911 System, Motorola received a minority stake in PSSI (with an option to purchase a larger stake) *and* it received access to PSSI's technology to facilitate the joint development of future products. It seems clear that the Product Development Agreement, which

---

clause in the Product Development Agreement.

[6] To support its contention that the Stock Purchase Agreement and the Product Development Agreement should not be construed together, PSSI directs our attention to our recent decision in PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland), 260 F.3d 453, 464 (5th Cir. 2001). In PaineWebber, we held that binding arbitration provisions in a set of Option Agreements did not apply to disputes arising under a separate Referral Agreement, which did not contain a binding arbitration provision. See id. Our holding in PaineWebber is easily distinguished from the present case. The agreements in PaineWebber were construed separately because (1) the securities trades at issue occurred outside the "strictly limited" effective period of the Option Agreements and (2) the parties explicitly provided that the trades "would be executed in accordance with the terms of the Referral Agreement" and explicitly declined to apply the terms of the Option Agreements. Id. at 463-64. In this case, by contrast, the Stock Purchase Agreement and the Product Development Agreement were executed at the same time as part of the same transaction. In addition, the Product Development Agreement contained no restrictions on its scope or duration, and its terms were not made subject to the terms of the Stock Purchase Agreement. In short, PaineWebber does not control our decision in the instant case.

11

governed access to each party's intellectual property as well as the parties' joint development efforts, was a central part of this transaction.[7] Although the arbitration provision in the Product Development Agreement is somewhat narrower than the provision at issue in <u>Neal</u>, we conclude that it is sufficiently broad to cover all disputes related to the entire transaction. It is of no moment that each element of the transaction focuses on a different aspect of the transaction and could be a valid free-standing contract.

In sum, we hold that, where the parties include a broad arbitration provision in an agreement that is "essential" to the overall transaction, we will presume that they intended the clause to reach all aspects of the transaction -- including those aspects governed by other contemporaneously executed agreements that are part of the same transaction. Thus, in the absence of a contrary expression of intent in the Stock Purchase Agreement, the arbitration provision in the Product Development Agreement covers all disputes related to the subject matter of the entire transaction between PSSI and Motorola. Because we cannot say "with positive assurance that [the] arbitration clause is not susceptible of an interpretation which would cover the dispute at issue," we

---

[7] As PSSI acknowledges, Motorola initiated talks with PSSI primarily for the purpose of gaining access to PSSI's advanced technology. For example, PSSI's amended complaint alleges that Motorola "expressed an interest in PSSI and licensing its technology" because Motorola had determined that "at least two more years of development work was necessary before the development of its . . . product progressed to the stage PSSI had already reached in its development of the Personal 911 System."

find that it applies to PSSI's claims under the Stock Purchase Agreement.

C

PSSI argues that, even assuming the arbitration provision in the Product Development Agreement can be construed to cover claims arising out of the Stock Purchase Agreement, the forum selection clause in the Stock Purchase Agreement forecloses this interpretation. Paragraph 6.7 of the Stock Purchase Agreement provides:

> Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. ANY SUIT OR PROCEEDING BROUGHT HEREUNDER SHALL BE SUBJECT TO THE EXCLUSIVE JURISDICTION OF THE COURTS LOCATED IN TEXAS.

Focusing on the term "exclusive jurisdiction," PSSI reads this provision to mean that any dispute arising out of the Stock Purchase Agreement must be litigated in Texas courts. PSSI argues that, because the parties "intended to confer solely upon Texas courts the power to decide" any dispute brought under the Stock Purchase Agreement, the parties expressly excluded the use of arbitration to resolve such a dispute.[8]

---

[8] In PaineWebber, 260 F.3d at 463, we held that an agreement to submit all disputes "'to the appropriate arbitrator or court in the United States'" was not a binding agreement to arbitrate because the provision plainly permits resolution of disputes either in court or by arbitration. In so holding, we noted that a binding agreement to arbitrate "precludes by its very terms any court resolution." Id. Read in context, it seems clear to us that this statement stands for the unremarkable proposition that only one adjudicatory body can resolve the merits of a dispute. The

13

We do not find PSSI's interpretation of the forum selection clause persuasive. Standing alone, one could plausibly read the forum selection clause to mean that Texas courts have the exclusive power to resolve all disputes arising under the Stock Purchase Agreement. But the forum selection clause does not stand alone. To the contrary, we must interpret the forum selection clause in the context of the entire contractual arrangement and we must give effect to all of the terms of that arrangement. See Richland Plantation Co. v. Justiss-Mears Oil Co., Inc., 671 F.2d 154, 156 (5th Cir. 1982) ("When several documents represent one agreement, all must be construed together in an attempt to discern the intent of the parties, reconciling apparently conflicting provisions and attempting to give effect to all of them, if possible."). Given our conclusion that the arbitration provision in the Product Development Agreement applies to all claims related to the overall transaction, we must therefore interpret the forum selection provision in the Stock Purchase Agreement in a manner that is consistent with the arbitration provision.

Reading the two provisions together, it becomes clear that the forum selection clause does not require the parties to litigate all claims in Texas courts, nor does it expressly forbid arbitration of claims arising under the Stock Purchase Agreement. Instead, we

_____

PaineWebber Court did not suggest that a binding arbitration provision precludes the litigation in court of disputes concerning the application and enforcement of that provision.

14

interpret the forum selection clause to mean that the parties must litigate in Texas courts only those disputes that are not subject to arbitration -- for example, a suit to challenge the validity or application of the arbitration clause or an action to enforce an arbitration award.[9] Rather than covering all "disputes" or all "claims" like the arbitration provision in the Product Development Agreement, the forum selection clause confers "exclusive jurisdiction" on Texas courts only with respect to "any suit or proceeding." This limitation suggests that the parties intended the clause to apply only in the event of a non-arbitrable dispute that must be litigated in court.[10]

Thus, read together with the arbitration provision, the forum selection clause in the Stock Purchase Agreement does not operate to bar arbitration of disputes where otherwise required by contract.[11] Consequently, we conclude that the claims in PSSI's

---

[9] Indeed, the parties' dispute concerning the scope of the arbitration clause in the Product Development Agreement was litigated in a "court located in Texas," in accordance with the forum selection clause.

[10] This reading comports with the plain meaning of the terms "suit" and "proceeding." See Webster's Third New Int'l Dictionary 2286 (1993) (defining "suit" as "an action or process in a court for the recovery of a right or claim"); id. at 1807 (defining a "proceeding" as "the course of procedure in a judicial action or in a suit in litigation").

[11] This interpretation of Paragraph 6.7 of the Stock Purchase Agreement is also consistent with cases holding that a forum selection clause cannot nullify an arbitration clause unless the forum selection clause specifically precludes arbitration. See Patten Securities Corp., Inc. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400, 407 (3d Cir. 1987) (holding that a forum

15

complaint must be arbitrated in accordance with the terms of the Product Development Agreement.

III

For the reasons set out above, we REVERSE the judgment of the district court denying Motorola's motion to compel arbitration of PSSI's claims and REMAND for entry of an order staying the litigation and requiring the parties to submit their dispute to binding arbitration.

REVERSED and REMANDED.

---

selection clause under which a party agreed to "submit to the jurisdiction" of courts located in New Jersey "with respect to controversies arising under this Agreement" did not preclude arbitration), abrogated on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 287 (1988); In re Winter Park Const., Inc., 30 S.W.3d 576, 578 (Tex.App.-Texarkana 2000, no pet.) (holding that an arbitration clause was not "superceded" by a forum selection clause providing that "[v]enue for any suit arising out of any relationship between Seller and Buyer shall be the appropriate court in Harrison county [sic], Texas").