United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 18, 2005**

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 14, 2005

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 04-31092

———————————————

JOEL J SAFER; MELANIE M SAFER; VICTORIA THOMPSON, as Trustee for
the Heidi Elizabeth Safer Insurance Trust No. 1, the
Joel Jarrett Safer II Insurance Trust No. 1, the Kelli
Carpenter Insurance Trust No. 1 and the Charles Patrick
Carpenter Insurance Trust No. 1

         Plaintiffs - Appellees

    v.

NELSON FINANCIAL GROUP INC.; WILLIAM J NELSON

         Defendants - Appellants

———————————————————————————————————————

         Appeal from the United States District Court
            for the Middle District of Louisiana

———————————————————————————————————————

Before KING, Chief Judge, and DAVIS, Circuit Judge, and
FITZWATER,* District Judge.

KING, Chief Judge:

    Defendants-Appellants William Nelson and Nelson Financial

Group, Inc. appeal the district court's denial of their motion

for order staying action pending arbitration and compelling

arbitration.  For the following reasons, we REVERSE the district

———————————————

    *    District Judge of the Northern District of Texas,
sitting by designation.

1

court's judgment denying this motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the spring of 2000, Dr. Joel Safer, a sixty-year-old dentist nearing retirement, received a solicitation from William Nelson, CEO of Nelson Financial Group, Inc.,[1] to attend a weekend investment seminar for dentists entitled the "Investment Strategies for the Roaring 2000's Weekend." According to the solicitation, an individual named Harvey Dent, Jr., had been reliably predicting the behavior of the stock market by tracking birth rates. The solicitation letter from Nelson stated that Dent's theories, and their applicability for future investment decisions, would be explained at the seminar. On April 7, 2000, Dr. Safer and his wife, Melanie Safer, attended the seminar.

On April 8, 2000, the Safers met privately with William Nelson to discuss their portfolio and financial planning needs. That same day, the Safers entered into several agreements with Nelson Financial regarding the management of their assets. First, Joel Safer signed an agreement captioned "Advisory Agreement with Nelson Financial Group, Inc." (the "Advisory Agreement"), which stated, inter alia, that in exchange for $2,500, Nelson Financial would provide him with a group presentation and a personalized written financial plan. With

---

[1]     Unless otherwise stated, we will refer to William Nelson and Nelson Financial Group, Inc. collectively as "Nelson."

respect to the implementation of investment advice provided by Nelson Financial, the Advisory Agreement stated:

> Remember, you are in control. Consequently, you are under no obligation to utilize our services or any company we may recommend. Should you decide to implement with us, and we hope you do, it will be in our role as Registered Representatives of Washington Square Securities, Inc., a registered securities broker/dealer and investment advisory firm. [Nelson Financial Group] will implement recommendations made through products offered by Washington Square Securities. [Nelson Financial Group] does not have discretionary authority to execute trades or full power of attorney. Consequently, we do not have authority to withdraw or to take custody of your funds or securities.

The Advisory Agreement further stated that:

> [Nelson Financial Group] is an Investment Advisor registered with the Ohio Division of Securities. [Nelson Financial Group] is not a "fee-only" Investment Advisor, and as such may accept commissions, fees or other compensation for the implementation of portfolios. Advisory Affiliates may be registered representatives of Washington Square Securities, an affiliated broker/dealer as disclosed in Form ADV, Part II. You may purchase insurance products or securities that may be recommended if appropriate during the course of Consultations services. When such products are purchased normal commissions may be earned.

The Advisory Agreement also contained a short mediation clause, which stated that "[i]f we are not able to resolve your concerns, we ask that we first seek to resolve any conflicts in Mediation before resorting to any other forum." Phyllis Nelson, William Nelson's wife and the president of Nelson Financial, signed the Advisory Agreement on behalf of Nelson Financial.

The same day that Dr. Safer signed the Advisory Agreement, he and Melanie Safer each signed separate agreements captioned

3

"New Account Information Form[s]." Phyllis Nelson also signed these agreements. The Safers entered into these agreements in order to open up brokerage accounts with Washington Square Securities through Nelson, a registered representative of Washington Square Securities. Subsequently, the Safers, individually or together, executed additional New Account Information Forms on June 9, 11, 12, 15, and 19, July 11, and October 10, 2000. They also executed Direct Business New Account Forms with Nelson Financial and Washington Square Securities on March 7, 2002 and January 4, 2003. All of the New Account Information Forms stated:

> I REPRESENT THAT I HAVE READ AND UNDERSTAND THE TERMS AND CONDITIONS GOVERNING THIS ACCOUNT AND AGREE TO BE BOUND BY SUCH TERMS. THIS ACCOUNT IS GOVERNED BY A PRE-DISPUTE ARBITRATION AGREEMENT ON THE BACK OF THIS NEW ACCOUNT INFORMATION FORM. I ACKNOWLEDGE RECEIPT OF THE PRE-DISPUTE ARBITRATION AGREEMENT.

Each form then contained the following arbitration agreement:

> PRE-DISPUTE ARBITRATION AGREEMENT
>
> Your account is subject to the arbitration rules of the National Association of Security Dealers, Inc. Arbitration is used to resolve a dispute between two parties. Because controversies involving brokerage firms often involve complicated issues, arbitration forums were conceived by the National Association of Securities Dealers, Inc. to provide an alternative dispute resolution mechanisms [sic] for investors which can be more efficient and less costly than court litigation. You should be aware of the following:
>
> a. Arbitration is final and binding on the parties.
>
> b. The parties are waiving their right to seek remedies in court including the right to a jury trial.

4

c.  Pre-arbitration discovery is generally more limited than and different from court proceedings.

d.  The arbitrators award is not required to include factual finding or legal reasoning and any parties [sic] right to appeal or seek modification of rulings by the arbitrators is strictly limited.

e.  The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree that any disputes or controversies that may arise between myself and Washington Square Securities, Inc. or a registered representative of Washington Square Securities, Inc., concerning any order or transaction, or the continuation, performance or breach of this or any other agreement between us, whether entered into before, on, or after the date this account is opened, shall be determined by arbitration before a panel of independent arbitrators set up by and in accordance with the rules and procedures of the National Association of Security Dealers, Inc. I understand that judgement upon any arbitration award may be entered in any court of competent jurisdiction.

The same weekend that the Advisory Agreement and the New Account Information Forms were signed, Nelson prepared a written financial plan for the Safers, which they ultimately chose to follow. In order to implement Nelson's investment recommendations, the Safers purchased life insurance policies and other investments from Nelson (acting as a registered representative of Washington Square Securities), and Nelson received commissions and transaction fees from these sales. By the fall of 2003, the total value of the assets that the Safers had invested with Nelson had fallen by fifty percent.

On March 22, 2004, the Safers, upset by the loss of more than half of their life savings, filed suit against William

Nelson and Nelson Financial in the United States District Court for the Middle District of Louisiana.[1] According to the Safers, Nelson recommended investments for them that were extremely aggressive and inappropriate for a couple close to retirement. Specifically, the Safers alleged five causes of action: (1) Inappropriate Investments; (2) Misrepresentation; (3) Breach of Fiduciary Duty; (4) Violation of Federal Securities Laws; and (5) Negligence. The Defendants responded by filing a motion for order staying action pending arbitration and compelling arbitration, in which they claimed that the pre-dispute arbitration clause found in the New Account Information Forms governed the dispute between the Safers and the Defendants. On October 13, 2004, the district court denied the Defendants' motion. In its order denying the motion, the district court found that the Advisory Agreement, which pertained to investment advice, was separate and distinct from the New Account Information Forms, which pertained to the execution of that advice. According to the district court, because the parties entered into two separate agreements for two separate services rendered, the arbitration clause found in the New Account Information Forms did not apply to disputes regarding the Advisory Agreement. The Defendants now appeal the district

---

[1]     Victoria Thompson, in her capacity as the trustee of the Safer-Carpenter trusts, was also named as a plaintiff in the lawsuit.

court's denial of their motion.  The parties have agreed to a stay of the district court action pending the outcome of this appeal.

## II. STANDARD OF REVIEW

We review the denial of a motion to compel arbitration de novo.  Primerica Life Ins. Co. v. Brown, 304 F.3d 469, 471 (5th Cir. 2002) (citing Webb v. Investacorp, 89 F.3d 252, 257 (5th Cir. 1996)).  When adjudicating a motion to compel arbitration, we first must determine whether the parties agreed to arbitrate the dispute in question.  Fleetwood Enters., Inc. v. Gaskamp, 280 F.3d 1069, 1073 (5th Cir. 2002).  In order to make this determination, we must decide: "(1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement."  Personal Sec. & Safety Sys., Inc. v. Motorola, Inc., 297 F.3d 388, 392 (5th Cir. 2002) (citing OPE Int'l LP v. Chet Morrison Contractors, Inc., 258 F.3d 443, 445 (5th Cir. 2001) (citations and internal quotation marks omitted)).  If we decide that the parties have agreed to arbitrate the dispute in question, we then must determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims."  Webb, 89 F.3d at 258.

The Fifth Circuit has repeatedly emphasized the strong federal policy in favor of arbitration.  See Neal v. Hardee's

7

Food Sys., Inc., 918 F.2d 34, 37 (5th Cir. 1990). When determining whether a dispute is covered by the scope of an arbitration agreement, the Supreme Court has held that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). The Fifth Circuit has likewise stated that doubts concerning the scope of an arbitration agreement should be resolved in favor of arbitration. See Neal, 918 F.2d at 37. Specifically, we have held that arbitration should not be denied "unless it can be said with positive assurance that [the] arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." Motorola, 297 F.3d at 392 (quoting Neal, 918 F.2d at 37 (internal quotation marks omitted) (alteration in original)).

## III. DISCUSSION

In the present case, the parties agree that each of the New Account Information Forms contains a valid arbitration clause. The parties disagree, however, about whether the scope of this arbitration clause encompasses the Safers' current dispute with the Defendants.

The Plaintiffs contend that they complain solely about Nelson's provision of inappropriate investment advice-- allegations that, in their estimation, only concern the Advisory Agreement. According to the Plaintiffs, the Advisory Agreement

8

and the New Account Information Forms are discrete and separate agreements. Accordingly, they argue that because they do not complain about the <u>implementation</u> of Nelson's financial advice, but complain only about the advice itself, their lawsuit pertains only to matters covered by the Advisory Agreement, which does not contain an arbitration clause.

The Defendants contend that the arbitration clause found in the New Account Information Forms applies to the present dispute between them and the Safers for three reasons. First, they claim that the plain language of the arbitration clause clearly covers this dispute. In support of this argument, the Defendants state that the arbitration clause applies not only to disputes between Washington Square and the Safers, as the Plaintiffs suggest, but also to "any disputes or controversies that may arise between myself [the Safers] and Washington Square Securities, Inc. or a registered representative of Washington Square Securities, Inc. [Nelson]." Along these lines, the Defendants contend that the arbitration clause does not cover just "orders or transactions," as both the district court and the Plaintiffs state, but also explicitly covers disputes between any of the parties concerning "the continuation, performance or breach of this or any other agreement between us, whether entered into before, on, or after the date this account is opened." According to the Defendants, this broad phrasing ensures that the scope of the arbitration clause in the New Account Forms covers any disputes arising out

9

of the Advisory Agreement. Second, the Defendants state that the district court appears to have been under the mistaken impression that the Safers did not execute an arbitration clause on the same day that the Advisory Agreement was signed. In fact, as the Defendants note, the Advisory Agreement was signed at the same time that the first New Account Information Forms, which each contained the arbitration clause, were signed. According to the Defendants, the contemporaneous execution of these agreements suggests that they are related and should be construed to be part of the same underlying transaction. Finally, the Defendants contend that the Safers' lawsuit complains about the implementation of investment advice, which is clearly arbitrable.

In determining whether the Plaintiffs' claims are covered by the arbitration agreement, we must decide whether "it can be said with positive assurance that [the] arbitration clause is not susceptible of <u>any</u> interpretation which would cover the dispute at issue." <u>Motorola</u>, 297 F.3d at 392 (quoting <u>Neal</u>, 918 F.2d at 37 (internal quotation marks omitted) (alteration in original)). Because we find that the arbitration clause can be interpreted in such a way as to cover the Plaintiffs' claims, and because we disagree with the Plaintiffs' contention that their claims pertain solely to the provision of financial advice and are governed solely by the terms of the Advisory Agreement, we agree with the Defendants that the scope of the arbitration clause covers the Plaintiffs' allegations. <u>Id.</u>

10

To begin with, as a factual matter, the Plaintiffs' claim that the allegations in their complaint relate solely to the Advisory Agreement fails. First, only one of the three Plaintiffs in this case was a party to the Advisory Agreement. The district court and the parties appear to have overlooked this important fact. Both the Plaintiffs and the Defendants state in their appellate briefs that the Advisory Agreement was between Nelson Financial and "the Safer<u>s</u>." (emphasis added). Similarly, the district court, in its opinion denying the motion to compel arbitration, stated that the Advisory Agreement was between Nelson Financial and "Joel Safer, et al ('Safers')." The record clearly indicates, however, that the Advisory Agreement was <u>only</u> between Nelson Financial and Joel Safer. Specifically, the Advisory Agreement was addressed only to Joel Safer, signed solely by Phyllis Nelson and Joel Safer, and contained no provisions that would indicate that it was entered into on behalf of any unnamed third parties. Neither Melanie Safer nor Valerie Thompson, both Plaintiffs in the present lawsuit, were parties to the Advisory Agreement. Joel Safer, Melanie Safer, and a trustee of the Safer-Carpenter trusts did, however, all sign New Account Information Forms and are, accordingly, bound by the arbitration clause found in them. As such, any allegations made by Melanie Safer and Valerie Thompson are outside of the scope of the Advisory Agreement.

Second, the Advisory Agreement specifically states that it

11

"terminates upon the delivery of the Written Financial Plan."
Nelson allegedly provided the Safers with this written financial
plan on the weekend of the investment seminar in April 2000. Any
allegations in the complaint relating to events occurring <u>after</u>
April of 2000, therefore, would not be covered by the terms of
the Advisory Agreement. The Plaintiffs, however, clearly allege
in their complaint that they were harmed by actions taken by the
Defendants long after April 2000. For instance, the Plaintiffs
state in their complaint that "[o]n or about August 15, 2000,
William J. Nelson came to Louisiana to meet with the Safers and
their attorney and discussed the status of the Safers'
investments made pursuant to their financial planning advice.
Defendants also delivered to the Safers, in Louisiana, materials
regarding the recommendations and advice and consultations
regarding the implementation of the plan." Similarly, the
Plaintiffs allege in their complaint that "[t]he defendants
mailed reports of the status of the investments to [the
Plaintiffs] in Louisiana during the course of their engagement by
[the Plaintiffs]. Further, defendants periodically communicated
with the Safers by telephone in Louisiana." Likewise, the
Plaintiffs complain about the fact that the Defendants received
commissions and transactional fees related to the purchase and
sale of investment products, fees that were incurred after the
Advisory Agreement had ostensibly terminated. Accordingly, the
Plaintiffs complain of actions that, by virtue of when they

12

occurred, are not covered by the terms of the Advisory Agreement.

Third, the Plaintiffs make allegations in their complaint that are outside of the scope of the Advisory Agreement, but are clearly covered by the arbitration clause found in the New Account Information Forms. Specifically, as noted above, the Plaintiffs state in their complaint that the Defendants "received commissions and transactional fees related to the sale of the life insurance policies and other investments that were placed in the trusts." The Plaintiffs then list in their complaint the damages they suffered as a result of the Defendants' alleged actions, including the "[p]ayment of transactional expenses, insurance premiums and commissions . . . ." In making this argument, the Plaintiffs specifically allege that they were harmed by the implementation of the Defendants' investment advice (by, e.g., paying to the Defendants commissions, premiums, and transactional expenses when the Defendants purchased or sold investment products on their behalf). These allegations are clearly outside of the scope of the Advisory Agreement, but fall squarely within the language of the arbitration clause found in the New Account Information Forms pertaining to disputes regarding an "order or transaction."

As can be seen from the discussion above, a review of the record belies the Plaintiffs' contention that their claims pertain solely to the provision of financial advice and are governed exclusively by the terms of the Advisory Agreement.

13

Additionally, a review of the record indicates that the Advisory Agreement and the New Account Information Form signed by Joel Safer on April 8, 2000 are related to each other and collectively constituted one transaction. This court has repeatedly found that when agreements are interdependent and exist to further a single goal, an arbitration clause in one of the agreements "reach[es] all aspects of the parties' relationship," including disputes that might arise out of the other agreement. Neal, 918 F.2d at 37-38; see also Motorola, 297 F.3d at 392-95. In determining whether two agreements are related, "it is well-settled law that several writings executed by the same parties substantially at the same time and relating to the same subject-matter may be read together as forming parts of one transaction." Bailey v. Hannibal & St. J. R.R. Co., 84 U.S. 96, 108 (1872); see also Neal, 918 F.2d at 37 ("[u]nder general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and part of the same transaction, are to be construed together."); Richland Plantation Co. v. Justiss-Mears Oil Co., Inc., 671 F.2d 154, 156 (5th Cir. 1982) ("When several documents represent one agreement, all must be construed together in an attempt to discern the intent of the parties, reconciling apparently conflicting provisions and attempting to give effect to all of them, if possible."). In the present case, the Advisory Agreement was signed at the same time that the first New Account Information Form was signed by Joel

14

Safer, these two agreements were signed by the same parties (Joel Safer and Phyllis Nelson), they were signed as part of one transaction, and they had the same purpose--to enable Nelson Financial and its representatives to act as the Safers' financial manager. The record clearly indicates that on April 8, 2000, the Safers agreed to have Nelson manage their money. In order to manage their money, Nelson, inter alia, agreed to advise them on investments and to carry out that advice. The agreements signed by Safer on April 8, 2000 were designed to give effect to this relationship, i.e., they were offered hand-in-hand as part of a single transaction designed to empower Nelson to manage the Safers' money. Separating the Advisory Agreement from the New Account Information Forms after the fact overlooks this reality about the Safers' dealings with Nelson on April 8, 2000 and drives an artificial wedge into the integrated transaction between them.

Moreover, to the extent that any of the Plaintiffs' claims do fall under the terms of the Advisory Agreement, the plain language of the arbitration clause of the New Account Information Forms specifically covers them. In the arbitration clause, the parties explicitly agreed that:

> [A]ny disputes or controversies that may arise between myself and Washington Square Securities, Inc. or a registered representative of Washington Square Securities, Inc. [Nelson], concerning any order or transaction, or the continuation, performance or breach of this or any other agreement between us, whether entered into before, on, or after the date this account

15

is opened, shall be determined by arbitration . . . . The Plaintiffs contend that "between us" refers only to agreements between the Safers and either Washington Square Securities or its registered representatives insofar as they are acting on behalf of Washington Square. Nothing in the arbitration clause, however, contains this limiting language. To the contrary, the plain language of the arbitration clause states that it covers all agreements between the Safers and registered representatives of Washington Square like Nelson, which would include the Advisory Agreement. This language from the arbitration clause, especially when viewed in light of the strong federal policy in favor of resolving disputes regarding the scope of arbitration clauses in favor of arbitration, can be read to include the Advisory Agreement. Arbitration of these claims is, therefore, required because it cannot "be said with positive assurance that [the] arbitration clause is not susceptible of any interpretation which would cover the dispute at issue." Motorola, 297 F.3d at 392.[2]

---

[2] The fact that the Advisory Agreement contains a weak mediation clause does not change this result. The mediation clause found in the Advisory Agreement simply states that "[i]f we [Nelson] are not able to resolve your concerns, we ask that we first seek to resolve any conflicts in Mediation before resorting to any other forum." This language is in no way contrary to that of the arbitration clause. To the contrary, when interpreted in the context of the parties' entire contractual relationship, we interpret the mediation clause merely as a request by Nelson to mediate prior to arbitration. See Motorola, 297 F.3d at 395-96 (sending a dispute to arbitration after finding no conflict between dispute resolution clauses in two separate, but related,

Accordingly, for the reasons stated above, the district court should have granted the Defendants' motion for order staying action pending arbitration and compelling arbitration. The Plaintiffs' contention that their claims pertain solely to the provision of investment advice and are governed only by the Advisory Agreement is wrong. To the contrary, the Plaintiffs make allegations that clearly pertain to the implementation of Nelson's financial advice. To the extent that the Plaintiffs do complain about the provision of financial advice, the plain language of the arbitration clause found in the New Account Information Forms, combined with the fact that the agreements at issue in this case were contemporaneously executed as part and parcel of a single transaction between the Safers and Nelson, compels us to conclude that the Plaintiffs' allegations fall within the scope of the arbitration clause. Because all three Plaintiffs have signed agreements containing this arbitration clause, this dispute should be resolved by arbitration.

## IV. CONCLUSION

For the foregoing reasons, we REVERSE the district court's judgment denying the Defendants' motion for order staying action pending arbitration and compelling arbitration and REMAND for entry of an order staying the litigation and requiring the parties to submit their dispute to binding arbitration.

---

agreements).

17