The I.D.E.A. Corporation d/b/a/ The T2C3 Group, Plaintiff,

v.

WC & R INTERESTS, INC. d/b/a Diamond Brand Canvas Products, Defendant.

No. EP–07–CV–318–PRM.

United States District Court, W.D. Texas, El Paso Division.

April 8, 2008.

Tommy O'Shea Gilstrap, Jr., T.O. Gilstrap, Jr., P.C., El Paso, TX, for Plaintiff.

Mark N. Osborn, Kemp Smith LLP, El Paso, TX, Rick H. Rosenblum, Ashley Elizabeth Street, Akin, Gump, Strauss, Hauer & Feld, L.L.P., San Antonio, TX, for Defendant.

### ORDER DENYING DEFENDANT'S MOTION TO DISMISS OR STAY PENDING ARBITRATION

PHILIP R. MARTINEZ, District Judge.

On this day, the Court considered Defendant WC & R Interests, Inc. d/b/a Diamond Brand Canvas Products's ("Defendant") "Opposed Motion to Dismiss or Stay Pending Arbitration," filed on January 16, 2008; Plaintiff The I.D.E.A. Corporation d/b/a/ The T2C3 Group's ("Plaintiff") "Response to Motion to Dismiss or Stay Pending Arbitration," filed on January 25, 2008; and Defendant's "Reply in Support of Opposed Motion to Dismiss or Stay Pending Arbitration," filed on February 5, 2008, in the above-captioned cause. After due consideration, the Court is of the opinion that Defendant's Motion should be denied for the reasons set forth below.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

This action involves two agreements executed by the parties. On October 30, 2004, Plaintiff, Defendant, and a third-party, Bulwark Electromagnetic Material Applicants, Inc. ("BEMA"), executed an Agreement to Manufacture Licensed Patented Products (the "Manufacturing Agreement"). Compl. ¶ 5; Pl.'s Resp. ¶ 1. Under the Manufacturing Agreement, Defendant agreed to manufacture "EMI Enclosure Products,"[2] which Plaintiff agreed to purchase in order to resell them to its customers. Compl. ¶ 10. BEMA owned the patent rights for the products and received a licensing fee as compensation for the parties' use of the patent rights. Def.'s Mot. Ex. 1. BEMA also agreed to provide technical, sales and engineering support. Id. Ex. 1. Shortly after executing the Manufacturing Agreement, Plaintiff alleges, and Defendant does not dispute, BEMA and Defendant entered into a security agreement which "granted Defendant a security interest in the patent rights." Compl. ¶ 18.

On February 8, 2005, Plaintiff and Defendant executed a Strategic Business Relationship Agreement and Memorandum of Understanding (the "BRA").[3] The BRA expressly obligates the parties to "identify business opportunities that would benefit from the participation of both companies ... [and] determine ... which business opportunities justify the preparation of a technical and cost proposal in response to

---

1. Given the ruling on the instant Motion, the Court denies as moot Defendant's "Motion for a Protective Order," filed on February 25, 2008, wherein Defendant moves the Court for a protective order staying discovery pending the resolution of the instant Motion.

2. "EMI Enclosure Products" are fabric-based electromagnetic enclosures "which allow for

secure communications." Compl. ¶ 8; Pl.'s Resp. ¶ 1.

3. The parties also executed a Contract for Professional Services on February 16, 2005, Compl. ¶¶ 6–7, which contract has no bearing on the instant action.

a solicitation for services or other formal request for a proposal." Def.'s Mot. Ex. 2. It contains an arbitration provision (the "arbitration provision") which states:

> [i]n the event of a dispute arising under this Agreement which cannot be settled ... both Parties agree to hire an attorney-at-law mutually acceptable to both Parties and to share equally the payment of said attorney.... The Parties agree to be bound by the decisions of said attorney.

*Id.* Ex 2. The coverage of this provision is at the heart of the instant Motion.

At some point after the parties executed the Manufacturing Agreement, BEMA ceased doing business and "failed to perform its obligations under the Manufacturing Agreement." Compl. ¶ 3. After BEMA ceased operations, Defendant foreclosed upon its security agreement with BEMA, and obtained the patent rights to the EMI Enclosure Products. Compl. ¶¶ 19–20; Def.'s Mot. 2 n. 2.

On September 14, 2007, Plaintiff filed a complaint alleging that since obtaining the patent rights, Defendant has breached the Manufacturing Agreement insofar as the quality, quantity, price, and delivery of the products do not comply with the terms of the Manufacturing Agreement. Compl. ¶¶ 29–34. Defendant argues that BEMA's failure to perform its contractual obligations "constituted a material breach of the Manufacturing Agreement," discharging Defendant from its obligations thereunder. Def.'s Mot. 3.

On January 16, 2008, Defendant filed the instant Motion asking the Court to order the parties to arbitrate Plaintiff's dispute and dismiss or stay the case pending the outcome of arbitration. *Id.* at 1, 7. Relying on the arbitration provision in the BRA, Defendant argues that the parties agreed to arbitrate disputes arising between them, and that the dispute in this cause falls within the scope of the arbitration provision. *Id.* at 1.

## II. LEGAL STANDARD

Pursuant to the Federal Arbitration Act, 9 U.S.C.A. § 2, "[a] written provision in any ... contract ... to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2 (West 2008).

■■■ Arbitration is a matter of contract between the parties. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *see also Volt Info. Scis. v. Bd. of Trs.,* 489 U.S. 468, 479, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ("Arbitration ... is a matter of consent, not coercion."). "There is a two-step inquiry to determine whether a party should be compelled to arbitrate." *JP Morgan Chase & Co. v. Conegie,* 492 F.3d 596, 598 (5th Cir.2007). "The Court must first ascertain whether the parties agreed to arbitrate the dispute." *Id.* This determination hinges upon (1) "whether there is a valid agreement to arbitrate between the parties," and (2) "whether the dispute falls within the scope of the arbitration agreement." *Id.* If the Court finds that the parties agreed to arbitrate, it moves to the second step and assesses " 'whether any federal statute or policy renders the claim nonarbitrable.' " *Id.* (quoting *Wash. Mut. Fin. Group, LLC v. Bailey,* 364 F.3d 260, 264 (5th Cir.2004)).

■■■ The parties agree that the BRA contains a valid arbitration provision and that the Manufacturing Agreement lacks

an arbitration provision.[4] Def.'s Mot. 5; Pl.'s Resp. ¶¶ 4, 8. There is no allegation that any federal statute or policy renders Plaintiff's claims nonarbitrable. Thus, the central issue is whether Plaintiff's claims, which arise solely out of an agreement absent an arbitration provision, fall within the scope of the BRA's arbitration provision.

## III. ANALYSIS

The scope of an arbitration agreement is governed by federal law. *Kirby Highland Lakes Surgery Ctr., L.L.P. v. Kirby*, 183 S.W.3d 891, 895–96 (Tex.App.-Austin 2006, no pet.). "[A]ll doubts considering the arbitrability of claims should be resolved in favor of arbitration." *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir.2002). A valid agreement to arbitrate applies to any claims unless it is certain "'that [the] arbitration clause is not susceptible of an interpretation which would cover the dispute at issue.'" *Pers. Sec. & Safety Sys. Inc. v. Motorola*, 297 F.3d 388, 392 (5th Cir.2002) (quoting *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir.1990)) (alteration in original).

Defendant contends that the "disputes raised by Plaintiff in this lawsuit fall within the scope of the arbitration provision." Def.'s Mot. 6. Plaintiff maintains that its claims arise under the Manufacturing Agreement and "fall[ ] outside the scope of

the arbitration agreement found in the [BRA]." Pl.'s Resp. ¶¶ 8, 11.

Plaintiff could be obligated to arbitrate its claims if Defendant is able to show: (1) the BRA's arbitration provision is written "broadly enough ... to encompass disputes under" the Manufacturing Agreement; (2) the BRA incorporates the Manufacturing Agreement by reference; or (3) the BRA and Manufacturing Agreement are so related that they should be construed as a single contract. *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 663 (7th Cir.2002). The Court turns to evaluate these three possibilities.

### 1. Whether the Arbitration Provision Should be Narrowly or Broadly Construed

Whether a particular claim related to an agreement other than the one containing an arbitration provision falls within the scope of the provision depends on whether the provision is construed narrowly or broadly. *Pers. Sec.*, 297 F.3d at 392. The Court "start[s], as always, with the language of the arbitration provision itself." *Id.* "[C]ourts distinguish 'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract." *Pennzoil Exploration & Prod. Co. v.*

---

4. Plaintiff argues the BRA is not an enforceable contract because it lacks consideration insofar as it "states that the parties '*may* present the [business] opportunities for consideration' [, and] [t]his discretionary language does not bind the parties to actually present business opportunities to one another." Pl.'s Resp. ¶ 12 (emphasis in original). Challenges to the validity of a contract as a whole does not affect the arbitrability of disputes arising out of the contract. *Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)

(reasoning that an arbitration clause is severable from the underlying contract); *see also Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471, 472 (5th Cir.2002) (compelling arbitration although the plaintiff argued that he lacked capacity to execute an agreement containing an arbitration clause because he did not specifically challenge the validity of the clause). Because Plaintiff does not dispute the validity of the arbitration clause, Pl.'s Resp. ¶¶ 4, 8, the Court need not address whether the BRA is an enforceable contract in order to resolve the instant Motion.

*Ramco Energy,* 139 F.3d 1061, 1067 (5th Cir.1998).

 An arbitration provision that expressly encompasses disputes "related to" or "connected with" the agreement containing the provision is construed broadly. *Id.* Such a provision is "not limited to claims that literally 'arise under the contract,' but rather embrace[s] all disputes between the parties having a significant relationship to the contract." *Id.* A broadly construed arbitration provision may encompass claims arising under a separate agreement. *See, e.g., Pers. Sec.,* 297 F.3d at 394 (holding that an arbitration provision, which covered "any and all claims . . . arising out of or relating to" an agreement, applied to claims arising under a separate agreement); *Neal,* 918 F.2d at 38 (holding that an arbitration provision encompassing "any and all disputes between [the parties], . . . reach[ed] all aspects of the parties' relationship," including claims arising under a separate agreement).

 In comparison, where an arbitration provision sets forth that it applies to any "dispute arising out of the [agreement]," it will be narrowly construed to encompass claims arising solely under the agreement. *Ikon Office Solutions v. Eifert,* 2 S.W.3d 688, 694 (Tex.App. -Houston [14th Dist.] 1999, pet. denied).

 The BRA's arbitration provision is limited to disputes "arising under this Agreement," thus distinguishing it from the provisions at issue in *Personal Securities* and *Neal.* Def.'s Mot. Ex. 2. Rather, it is similar to the provision at issue in *Ikon* as it purports to cover disputes arising under the "[a]greement," and contains no language indicating that it applies to disputes arising under any agreement other than the BRA. "To include [Plaintiff]'s claims within the scope of this arbitration

clause would expand the operation of that clause beyond its express terms and beyond the intent of the parties." *See Rosenblum,* 299 F.3d at 664 (holding that a narrowly drafted arbitration provision did not apply to claims arising under a separate agreement). The Court thus finds that the scope of the arbitration provision is not broad enough to encompass disputes arising under the Manufacturing Agreement.

### 2. Whether the BRA Incorporates the Manufacturing Agreement

Defendant acknowledges that Plaintiff's claims arise under the Manufacturing Agreement, but argues that an inclusionary provision in the BRA incorporates the Manufacturing Agreement into the BRA. Def.'s Mot. 1. Defendant thus contends Plaintiff's claims are subject to the arbitration provision. *Id.*

Plaintiff does not specifically address the inclusionary provision, but argues there is "no mention of the [BRA] in the Manufacturing Agreement and vice versa." Pl.'s Resp. ¶ 11. Plaintiff argues an "entire agreement" clause in the Manufacturing Agreement prevents reading the BRA to incorporate the Manufacturing Agreement. *Id.*

 "Under the doctrine of incorporation by reference, where one contract refers to another contract or instrument, the second document may properly constitute part of the original contract." *In re Cappadonna Elec.,* 180 S.W.3d 364, 371 (Tex.App.-Corpus Christi 2005, no pet.). "An arbitration agreement is not invalid or unenforceable merely because it is contained in a document incorporated into the contract by reference." *Teal Constr. Co. v. Darren Casey Interests, Inc.,* 46 S.W.3d 417, 420 (Tex.App.-Austin 2001, pet. denied). One agreement may incorporate another by its express terms. *See, e.g.,*

*Ikon,* 2 S.W.3d at 693 (finding an acquisition agreement incorporated an employment agreement and its arbitration where the acquisition agreement "referr[ed] directly to the Employment Agreement as Exhibit E and stat[ed] that all attached exhibits [were] incorporated by reference and expressly made part of the Acquisition Agreement.").

### a. The Inclusionary Provision

■ The inclusionary provision in the BRA states: "[t]his Agreement covers all contracts and agreements between [Plaintiff] and [Defendant] relating to the subject matter hereof. . . . All other contracts or agreements . . . which relate to the subject matter of this Agreement, are hereby terminated." Def.'s Mot. Ex. 2. The term "subject matter" is not defined in the BRA.

The Manufacturing Agreement does not refer to the BRA, and the BRA does not refer to the Manufacturing Agreement. Moreover, neither agreement is attached to the other in any manner. Regarding the inclusionary provision, if, as Defendant suggests, the "subject matter" of the BRA is interpreted to include the Manufacturing Agreement, then, as set forth in the inclusionary provision, the Manufacturing Agreement would be terminated as one of the "other contracts or agreements" mentioned. However, there is no argument from either party that the Manufacturing Agreement was terminated upon execution of the BRA. Therefore, the inclusionary provision does not incorporate the Manufacturing Agreement into the BRA.

### b. The Entire Agreement Clause

■ An entire agreement clause is evidence than an agreement "forms the complete agreement of the parties" with respect to the subject matter addressed therein. *Perlstein v. D. Steller 3, Ltd.,* 109 S.W.3d 36, 41 (Tex.App.-Corpus Christi 2003, pet. denied) (discussing a clause stating that an agreement "represent[ed] the entire and complete agreement of the [parties] with respect to the subject matter hereof."). An entire agreement clause demonstrates that the parties did not intend for an arbitration provision contained in the same agreement to apply to claims arising under a separate agreement. *See Sino Swearingen Aircraft Corp. v. Bell Aviation, Inc. et al.,* No. 05–03–01618–CV, 2004 WL 1193960, at *2 (Tex.App.-Dallas 2004, no pet.) (holding that an entire agreement clause "shows the parties' intent that the Aircraft Purchase Agreement be a separate contract, not subject to the conditions and provisions of the Distributorship Agreement.").

■ The entire agreement clause in the Manufacturing Agreement reads: "[t]his document contains the entire agreement between the parties with respect to the subject matter thereof." Def.'s Mot. Ex. 1, ¶ 11. This clause supports Plaintiff's contention that the BRA does not incorporate the Manufacturing Agreement insofar as it provides that the Manufacturing Agreement is an inclusive agreement. This finding, in addition to the absence of a reference to the Manufacturing Agreement in the BRA, compels the conclusion that the BRA neither incorporates the Manufacturing Agreement nor subjects claims arising under the Manufacturing Agreement to arbitration.

### 3. Whether the BRA and Manufacturing Agreement Should be Construed Together as a Single Contract

■ Defendant contends that "the parties intended for the Manufacturing Agreement and the [BRA] to be read together and, thus for the arbitration clause to cover disputes alleging breach of any portion of the Agreements." Def.'s Reply 3. De-

fendant submits that the Manufacturing Agreement and the BRA were executed for "the common purpose of supporting the manufacture and sale of tactical shielded enclosures," and relies on Plaintiff's assertion "that the [BRA] was executed to 'accommodate and support' the Manufacturing Agreement." Def.'s Reply 4; Def.'s Mot. 6 (quoting Compl. ¶ 6).

Plaintiff argues that the parties did not intend for the BRA and the Manufacturing Agreement to be construed together because the agreements (1) were executed more than three months apart, (2) do not refer to the existence or execution of each other, and (3) are neither interrelated nor integral to each other. Pl.'s Resp. ¶¶ 12–13.

 Separate agreements should be construed together if they are executed contemporaneously, "for the same purpose" and as "interrelated parts of one deal," and if "the arbitration provision is contained in an agreement that [is] essential to the overall transaction." *Pers. Sec.*, 297 F.3d at 393. In *Personal Securities*, the Fifth Circuit construed together an agreement containing an arbitration provision and another agreement absent such a provision where the two agreements were executed "contemporaneously" and were "integral" to each other, and where the arbitration provision was "essential to the overall transaction." *Id.* at 395.

Similarly, in *Neal*, the Fifth Circuit held that an arbitration provision contained in one agreement applied to claims arising under a separate agreement where the two agreements were executed three days apart (which the court construed as "contemporaneous"), and "for the same purposes." *Neal*, 918 F.2d at 37. "[E]ach agreement was dependent on the entire transaction" and the agreement containing the arbitration provision was essential to the transaction. *Id.* at 38.

However, federal and Texas state courts have declined to construe together agreements relating to the same subject matter based on the provisions in the agreements. In *Rosenblum*, for example, the Seventh Circuit declined to construe together two agreements which "were both necessary, but self-contained ... components of a comprehensive business transaction." *Rosenblum*, 299 F.3d at 663. "While the contracts are related, they are not two sections of the same agreement; they are separate, free-standing contracts. Each contract delineates rights and duties independent of the other and that pertain to a particular subject matter. One contract may be fully performed while the other is breached." *Id.* In *In Re Sino*, a Texas appellate court declined to apply an arbitration provision in one agreement to a dispute arising under a separate agreement where the agreements related to the same transaction, but the arbitration provision expressly applied only to disputes arising under the "Agreement," the definition of which term did not include the separate agreement. *In Re Sino*, 2004 WL 1193960, at *2.

The express purpose of the Manufacturing Agreement is to "establish a licensed manufacturing capability that will support the anticipated sales of products produced under BEMA's patented technologies." Def.'s Mot. Ex. 1. The BRA sets forth that the parties "wish to establish a formal joint sales, promotional, and business relationship which both firms believe will enhance business opportunities in [Plaintiff's] business area ... and [Defendant's] area of expertise...." *Id.* Ex. 2.

The parties executed the Manufacturing Agreement in October 2004, and the BRA in February 2005. This three month gap in execution counsels against finding that the parties intended to construe the agreements together as a single contract.

Moreover, unlike the agreements in *Personal Securities* and *Neal,* neither the Manufacturing Agreement nor the BRA expressly acknowledges the execution of the other in any manner. *See Pers. Sec.,* 297 F.3d at 393 (stock purchase agreement stated that "in connection with the purchase and loan, [the parties] desire to enter into certain other agreements," and "expressly refers to the purchase development agreement as one of those agreements"); *Neal,* 918 F.2d at 37 (purchasing agreement "acknowledged that the parties would contemporaneously enter into the licence agreement").

Certainly, the Manufacturing Agreement and the BRA are related insofar as both address the business relationship between the parties. *See* Compl. ¶ 6 (describing the BRA as "accommodating and supporting" the Manufacturing Agreement). However, Plaintiff's claims arise under the Manufacturing Agreement, which obligates Defendant to manufacture certain products. By contrast, the BRA governs how the parties will handle any business opportunities which may arise during the course of their business relationship. Its provisions set forth how the parties shall prepare business proposals, present business opportunities, and handle any financial matters associated with joint business ventures. Similar to the agreements in *Rosenblum,* the Manufacturing Agreement and the BRA are separate agreements, and the terms of each can be fulfilled independently of the other. Moreover, interpreting the Manufacturing Agreement does not depend on the construction of any portion of the BRA. *See Rosen v. Mega Bloks Inc.,* No. 06 Civ. 3474, 2007 WL 1958968, at *5-6 (S.D.N.Y. July 6, 2007) (holding that an arbitration provision in an employment agreement did not apply to claims arising under a purchase agreement where construing the purchase agreement did not require interpreting the employment agreement).

Thus, the Court finds no indication that the parties intended for the terms of the BRA to apply to disputes arising under the Manufacturing Agreement and declines to construe the BRA and the Manufacturing Agreement together as a single contract.

Given that the arbitration provision applies only to disputes arising under the BRA, the Court concludes that the Manufacturing Agreement is not incorporated into the BRA, and that the two agreements should not be construed together. Hence, the arbitration provision is not susceptible of an interpretation which would cover Plaintiff's claims.

## IV. CONCLUSION

The Court holds that the BRA's narrowly-drafted arbitration provision does not encompass Plaintiff's claims, which arise under the Manufacturing Agreement, and concludes Defendant's Motion should be denied.

Accordingly, **IT IS ORDERED** that Defendant WC & R Interests, Inc. d/b/a Diamond Brand Canvas Products's "Opposed Motion to Dismiss or Stay Pending Arbitration" (Docket No. 12) is **DENIED.**