

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00417-CV

U.S. CAPITAL INVESTMENTS, LLC
AND MASSOOD DANESHPAJOOH

APPELLANTS

V.

SHAWN SHAHBAZI, SHELL ON
WESTERN, INC. AND ROYAL WEST
INVESTMENTS LLC, SERIES E

APPELLEES

------------

## FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellants U.S. Capital Investments, LLC and Massood Daneshpajooh (Pajooh) conducted a number of commercial real estate transactions with Appellees Shawn Shahbazi; Shell on Western, Inc.; and Royal West Investments

---

[1]*See* Tex. R. App. P. 47.4.

LLC, Series E (RWI, Series E).  The parties later became embroiled in litigation with each other over claims that the transactions were induced by and tainted with fraud and misrepresentations.  In this appeal following a jury trial, Appellants argue in five issues that the trial court erred by granting a directed verdict, refusing to submit jury questions, and disregarding a jury answer related to their fraud and misrepresentation claims; that the trial court abused its discretion by admitting an exhibit related to Appellees' damages; and that the evidence is legally and factually insufficient to support the jury's damages finding.  We will affirm.

## II. BACKGROUND

Pajooh is a commercial real estate developer and investor from Houston. He obtains loans, builds shopping centers, and leases the space, and he buys, sells, swaps, and owns commercial properties.  Pajooh is the principal owner or member of several entities that he uses to carry out his business dealings, including U.S. Capital and County Investment LP.

Shahbazi is a commercial real estate investor from Los Angeles.  He buys, sells, and leases primarily multi- and single-tenant properties, and, like Pajooh, he is the principal owner or member of several entities that he uses to conduct his business, including Shell on Western and RWI, Series E.

In late 2007, Shahbazi contacted Pajooh to inquire about a number of properties that Pajooh owned in Houston and had listed on the Internet. Thereafter, Shahbazi traveled to Houston several times, viewed Pajooh's

2

properties, and expressed interest in some of them, including one located at 675 West Rankin that had a monthly revenue of approximately $18,500. At some point during their discussions about 675 West Rankin, Shahbazi told Pajooh about a property that Shahbazi owned in Fort Worth—a gas station and convenience store located on Western Center Boulevard that had a Church's Chicken franchise operating inside. According to Pajooh, Shahbazi (i) gave him a document (Plaintiff's Exhibit 1) showing that the "Shell on Western" had an average net operating income of $33,050 per month and (ii) represented that he owned the Church's Chicken franchise. Relying on Shahbazi's representations, Pajooh agreed to swap his 675 West Rankin property plus $200,000 for Shahbazi's Fort Worth convenience store, including the real property on which the store was located. Pajooh, however, was unable to acquire financing for the deal, so he and Shahbazi entered into an Asset Sale and Purchase Contract whereby U.S. Capital paid $400,000 for Shell on Western's assets. Pajooh traded equity in his 675 West Rankin property to cover the $400,000 (which did not include the charge for the store's inventory), and he owner-financed Shahbazi's purchase of 675 West Rankin for $1.8 million, which closed on the same day as the asset purchase. The Bill of Sale and one other document that Pajooh and Shahbazi executed in relation to the asset purchase contain what Appellants refer to as "disclaimer of reliance provisions"—confirmations that U.S. Capital did not rely on any representations made by Shell on Western in determining to proceed with the asset purchase.

3

In addition to purchasing Shell on Western's assets, U.S. Capital agreed to lease the convenience store from RWI, Series E for two years, with an option to purchase the real property for $2 million. Pajooh personally guaranteed U.S. Capital's performance under the lease agreement. Unlike the asset purchase documents, neither the lease agreement nor the guaranty contain any disclaimer-of-reliance provisions.[2] The parties signed the asset purchase documents, the lease agreement, and the guaranty on the same day—May 21, 2008—at the office of the attorney who prepared the asset purchase documents.

U.S. Capital operated the convenience store for over two-and-a-half years. Within the first few weeks or months of ownership, Pajooh noticed that the business was not generating monthly net operating income of $33,050. He had also thought that the asset purchase included the Church's Chicken franchise, but he soon discovered that Nazih Bayaa, Shell on Western's owner before Shahbazi, owned the franchise. Pajooh took steps to take over the franchise, but he was ultimately unsuccessful. During his ownership of the convenience store, Pajooh upgraded the gas pumps, installed a surveillance system, obtained a liquor license, retained the same management and vendors that Shahbazi had used when he had owned the business, and used some of his own money to

---

[2]The lease agreement does contain a provision stating that U.S. Capital did not rely upon any representation made by RWI, Series E, but the provision concerns "matters related to the use of the leased premises or Property," not representations regarding net operating income.

4

cover expenses, but the business never earned net operating income of $33,050 per month.

U.S. Capital vacated the convenience store in January 2011 and sued Appellees for fraud and misrepresentations in the asset purchase, lease agreement, and guaranty transactions. Appellees asserted counterclaims and sued Pajooh individually, seeking damages for, among other things, unpaid rent, inventory that Pajooh never paid for, and expenses incurred upon taking possession of the convenience store. Pajooh asserted counterclaims for fraud and misrepresentation against Appellees.

At the jury trial, Pajooh testified that he developed a close relationship with Shahbazi during their dealings and that he thought Shahbazi was an honest person. Pajooh explained that he had reasonably relied on Shahbazi's representations about the convenience store's net operating income and the Church's Chicken franchise; that the representations were false; and that he would not have agreed to the asset purchase, lease agreement, and guaranty had he been aware of Shahbazi's misrepresentations.

Shahbazi denied ever giving Pajooh the document showing that the convenience store had a net operating income of $33,050 per month. Instead, Shahbazi testified that he had given Pajooh Defendant's Exhibit 28—a "Business Profit Analysis" reflecting that the Shell on Western had a net operating income

of $19,700.[3]  Nevertheless, Shahbazi said that Pajooh had requested and reviewed numerous financial documents before executing the agreements and that he did not even believe the $19,700 figure; Pajooh concluded that the business was making approximately $8,000 per month.  Shahbazi also explained that if the convenience store had netted approximately $33,000 per month, then Pajooh would have had a 99% return on his $400,000 investment in only one year.  Shahbazi opined that he would not have sold a business that produced that amount of income for less than $1.4 or $1.5 million.  Shahbazi testified that he had told Pajooh early in their conversations that he did not own the Church's Chicken franchise and that Pajooh had failed to pay numerous debts that the store had incurred before vacating the property and to properly maintain or repair numerous pieces of equipment at the store.

After Appellees rested, the trial court granted a directed verdict in favor of Appellees on Appellants' fraud and misrepresentation claims, with the exception of those relating to the guaranty, concluding that the disclaimer-of-reliance provisions contained in the asset purchase documents conclusively negated the reliance element of Appellants' claims.  The jury then found that U.S. Capital failed to comply with the Asset Sale and Purchase Contract but that Shell on

---

[3]In preparing Defendant's Exhibit 28, Shahbazi essentially adopted the form of a similar document that was used by a broker who had helped Shahbazi purchase the Shell on Western.  There are other noticeable differences between Defendant's Exhibit 28 and Plaintiff's Exhibit 1, including the insertion of a disclaimer at the bottom of the document.

Western had sustained damages in the amount of $0; that U.S. Capital failed to comply with its lease agreement with RWI, Series E and that RWI, Series E had sustained damages in the amount of $352,380; that Pajooh failed to perform his obligations under his guaranty of the lease agreement but that the guaranty was procured by fraud that excused his performance thereunder; and that Shell on Western and RWI, Series E were entitled to recover attorneys' fees for representation in the trial court, the court of appeals, and the supreme court. The trial court later granted Appellees' motion to disregard the jury's finding that Pajooh's guaranty of the lease agreement was procured by fraud. Consequently, the trial court signed a final judgment in favor of RWI, Series E and against U.S. Capital and Pajooh jointly and severally in the amount of $352,380 plus attorneys' fees.

### III. ENFORCEABILITY OF DISCLAIMER-OF-RELIANCE PROVISIONS

Appellants argue in their first and second issues that the trial court erred by granting a directed verdict and abused its discretion by not submitting jury questions on Appellants' fraud and misrepresentation claims and affirmative defenses, and they argue in their third issue that the trial court erred by disregarding the jury's finding that Pajooh's guaranty of the lease agreement was procured by fraud. All three issues implicate the trial court's conclusion that the disclaimer-of-reliance provisions contained in the Asset Sale and Purchase Contract are enforceable and, therefore, negated as a matter of law the reliance element of the fraud and misrepresentation claims that Appellants alleged in

7

connection with their execution of the Asset Sale and Purchase Contract, the lease agreement, and the guaranty. We therefore address these three issues together.

## A. Standards of Review

A directed verdict is proper when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App.—Fort Worth 2009, pet. denied). Likewise, the trial court may disregard a jury finding if there is no evidence to support the finding or if it is immaterial. *GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 831 (Tex. App.—Fort Worth 2008, no pet.). We follow the standards for assessing legal sufficiency of the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We review the trial court's submission of jury questions for an abuse of discretion. *Bedford v. Moore,* 166 S.W.3d 454, 458 (Tex. App.—Fort Worth 2005, no pet.).

## B. Disclaimer-of-Reliance Law and Provisions

"As a rule, a party is not bound by a contract procured by fraud." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). However, contracting parties have the power to craft provisions that disclaim reliance on prior representations, and reliance, of course, is an element common to both fraud and misrepresentation claims. *Schlumberger Tech. Corp.*

8

*v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997); *see Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). Juxtaposing these well-established doctrines leads to controversies like the one in this case, in which one side claims that the contractually embodied intent of the parties was to disclaim reliance on prior representations, and the other complains that it would not have assented to the agreement had it known of a particular misrepresentation.

Addressing this issue, our supreme court has reasoned that "[t]he contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding." *Schlumberger*, 959 S.W.2d at 177–81; *see Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331–36 (Tex. 2011); *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008). Specifically, the threshold requirement for an effective disclaimer of reliance is that the contractual language be "clear and unequivocal" in its expression of the parties' intent to disclaim reliance. *Italian Cowboy*, 341 S.W.3d at 336; *Schlumberger*, 959 S.W.2d at 179. If the provision is clear and unequivocal, the court should then consider the circumstances surrounding the contract's formation. *Italian Cowboy*, 341 S.W.3d at 337 n.8. Factors that are relevant to that inquiry include whether the terms of the contract were negotiated, rather than boilerplate; whether during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; whether the complaining party was represented by counsel; whether the parties dealt with

9

each other in an arm's-length transaction; whether the parties were knowledgeable in business matters; and whether the release language was clear. *Id.*; *see Forest Oil*, 268 S.W.3d at 60; *Matlock Place Apartments, L.P. v. Druce*, 369 S.W.3d 355, 369–73 (Tex. App.—Fort Worth 2012, pet. denied). An enforceable disclaimer-of-reliance provision will conclusively negate the reliance necessary for a fraud and misrepresentation claim. *Forest Oil*, 268 S.W.3d at 60, 62. The question of whether an adequate disclaimer of reliance exists is a question of law. *Italian Cowboy*, 341 S.W.3d at 333.

Here, the Bill of Sale for the Asset Sale and Purchase Contract provides in relevant part as follows:

> WITH THE EXCEPTION OF THE WARRANTIES OF TITLE, INCLUDING THE WARRANTY THAT NO LIENS EXIST ON THE TRANSFERRED PROPERTIES EXCEPT AS RECITED, [Shell on Western] HAS MADE NO AFFIRMATION OF FACT OR PROMISE RELATING TO THE TRANSFERRED PROPERTIES THAT HAS BECOME ANY BASIS OF THIS BARGAIN, AND FURTHER, [Shell on Western] HAS MADE NO AFFIRMATION OF FACT OR PROMISE RELATING TO THE TRANSFERRED PROPERTIES THAT WOULD CONFORM TO ANY SUCH AFFIRMATION OR PROMISE.

Pajooh, on behalf of U.S. Capital, and Shahbazi, on behalf of Shell on Western, signed the document. Pajooh and Shahbazi also signed an "Acknowledgment and Hold Harmless Agreement," another part of the Asset Sale and Purchase Contract, that stated in relevant part,

> The Buyer [U.S. Capital] hereby acknowledges that it has done its own due diligence in making its determination to proceed with its purchase of the business and has not relied on any representations by the Seller in making its determination. Buyer

10

acknowledges that it has made an independent determination as to the feasibility of the profitability of the operation of said business, and after careful evaluation has determined to move forward and purchase the business according to the terms of the contract. . . .

Buyer hereby releases and holds the Seller harmless of any and all liability regarding the sale of the business within the limits of the law.[4]

## C. Enforceability of Disclaimer-of-Reliance Provisions as to Asset Sale and Purchase Contract

The asset purchase documents that Pajooh signed on behalf of U.S. Capital thus contain not one, but two disclaimer-of-reliance provisions confirming that U.S. Capital did not rely on any representations made by Shell on Western in deciding to sign the Asset Sale and Purchase Contract. The disclaimers are unconditional and easy to understand. The disclaimer contained in the three-page Bill of Sale is written in capital letters and located just above where Pajooh signed the document; it is not buried among dozens of other provisions in a lengthy document. And while the disclaimer in the Acknowledgment and Hold Harmless Agreement is not written in capital letters, the document is only a half-page long. We hold that the disclaimer provisions clearly and unequivocally

---

[4]The parties additionally signed a "Closing Acknowledgement," pursuant to which each party acknowledged that it had conducted an independent investigation or assessment of the material facts relied upon in the transaction. But the document, when read in its entirety, is primarily meant to confirm that the law firm responsible for preparing the asset purchase documents provided no legal advice and that neither U.S. Capital nor Shell on Western relied upon any representations by the law firm.

11

express the parties' intent to disclaim reliance on prior representations. *See id.* at 336; *Schlumberger*, 959 S.W.2d at 179.

Regarding the circumstances surrounding the formation of the agreement, Shahbazi testified that he chose Julia Barth, a real estate attorney who owns a law firm and a title company, to prepare the documents and that he and Pajooh met at Barth's office to sign the documents. Barth explained, and Pajooh and Shahbazi signed a document confirming, that she acted as a neutral third party whose only role was to prepare the documents for Pajooh and Shahbazi to review and sign. Indeed, she testified that she did not give any legal advice to either party, that neither side was represented by an attorney, and that she "papered [the] transaction and did the escrow services on [the] transaction." Barth explained where she obtained the information to prepare the documents:

> [Barth]: I had done, I think, three transactions for these same parties. And, typically, they would call me and give me instructions on what the terms of their deal was, and then I would draft documents, send them out to the parties, and then they would call me or come into my office and explain what they want to change, and I would change them on the spot, hand them back out until documents were in the form that the parties agreed on.
>
> [Shahbazi's counsel]: Is that probably what you did in this particular case?
>
> [Barth]: I'm sure that's what I did in this particular case.

Pajooh testified that the disclaimer-of-reliance provisions were not negotiated or discussed and that he did not review the documents before signing

them, but Barth had a different recollection of Pajooh's participation in the process:

> [Barth]: Danesh is pretty sophisticated. And both . . . parties instructed me on changes to make to the documents. They argued a lot amongst themselves. They tied up my conference room for a full day, I think, on this transaction arguing about the terms of the deal. Because . . . [m]y policy is I don't get in the middle of it. I wait for them to come to their agreement and then let me know what it is they want me to do. So both of them are heavily involved in making sure these documents were how they wanted them to be.

> [Shahbazi's counsel]: If Mr. Pajooh had represented to this jury that he was inexperienced in this kind of thing, would that be your observation?

> [Barth]: No.

> [Shahbazi's counsel]: And if Mr. Pajooh represented to this jury that he didn't have a chance to read the documents you prepared, would that be your recollection?

> [Barth]: No.

> [Shahbazi's counsel]: Okay. To your knowledge, did you observe Mr. Pajooh actively participating in various drafts of these documents?

> [Barth]: Yes.

>     . . . .

> [Shahbazi's counsel]: Would you ever personally close a transaction with someone who had not had an opportunity to read the papers?

> [Barth]: No.

> [Shahbazi's counsel]: Okay. If someone asked you -- For example, if Mr. Pajooh had asked you in this case, "I'm not ready to close. I need to take these papers to a lawyer," would you have postponed the closing?

[Barth]:  Yes.

[Shahbazi's counsel]:  If he had said, "I need to have my CPA consulted on this, and I'm not ready to sign them until I talk to my CPA," would you have postponed the closing?

[Barth]:  Yes.

[Shahbazi's counsel]:  Can you force anybody to sign papers at a closing?

[Barth]:  No.  And I didn't during this transaction.

Barth elaborated even further during what was apparently a particularly heated cross-examination,

[Barth]:  And I just also want you to know I'm not here because I want to be, and I don't really care about either one of these two guys.  But this guy came into my office and negotiated all day long with this guy until they came up with an agreement they both were happy with and they both signed their name to.

[Pajooh's counsel]:  And the provisions that we've talked about are none of the things they evidently negotiated, because none of them got changed.

[Barth]:  I wouldn't know.  I wasn't there.

[Pajooh's counsel]:  I asked you if these were your -- was this your wording, and you said "yes."

[Barth]:  This is my wording, --

. . . .

[Barth]:  -- but these two parties reviewed the documents, read the documents, signed the documents, because they agreed to the language in the documents.  I don't understand --

14

Are you trying to make it look like -- It seems like you want me to say like I pushed this guy or this guy to sign something. I don't care. People can sign or not sign. They can close or not close.

This guy and this guy, these are the terms they asked me to prepare. I prepared them and they signed them, and they went away happy campers until later somebody clearly wasn't happy. And that's why I prepared all these documents, because I see this all the time as a real estate attorney and a business attorney. People buy stores and then they can't run them and then they run them into the ground and they get pissed because the seller supposedly misrepresented.

A primary underlying consideration in evaluating the enforceability of a disclaimer-of-reliance provision is the sophistication of the parties involved. *See Italian Cowboy*, 341 S.W.3d at 332–36. Shahbazi described Pajooh as a "very good negotiator" and further testified,

He's a very smart businessman. He's very intelligent. He knows real estate very well. He knows all the contract. He understands the part -- each part of the contract. He knows it better than me. He taught me a lot of stuff even in the lease and contract. He said he has bachelor's degree in engineering. He said he has master's degree in economy, I believe. And he also told me he went to law school. So he -- he could read and write very nice, better than me, maybe.

Barth described Pajooh as sophisticated no fewer than three times during her testimony and also said that he had told her that he went to law school. Pajooh has an engineering degree and a master's degree in industrial management.

Even in the absence of Shahbazi's and Barth's testimony, the record reveals that Pajooh is an experienced real estate investor who knows his craft well—he owns multiple properties, he is the principal owner or member of multiple entities that he uses to operate his business, he understands and has

15

the ability to utilize financial documents related to his business transactions, and he is skilled in negotiating real estate business deals. The trial court denied Shahbazi's motion for a directed verdict as to Pajooh's fraud and misrepresentation claims after Pajooh rested, but it changed course and granted the motion after Shahbazi had presented his evidence and rested. The trial court's reasoning for doing so is apparent—the evidence considered as a whole overwhelmingly demonstrates that Pajooh is a sophisticated business player who knew precisely what he was doing when he executed the asset purchase documents on behalf of U.S. Capital. Neither Pajooh nor Shahbazi were represented by counsel, and there is conflicting evidence regarding whether the disclaimer-of-reliance provisions were specifically negotiated; but there is considerable evidence that an arm's-length transaction occurred on May 21, 2008, between two individuals who are experienced and knowledgeable in business matters, particularly Pajooh. Accordingly, having concluded that the disclaimer provisions clearly and unequivocally express the parties' intent to disclaim reliance on prior representations, and having considered the circumstances surrounding the contract's formation, we hold that, as to the Asset Sale and Purchase Contract, the disclaimer-of-reliance provisions are enforceable.

**D. Enforceability of Disclaimer-of-Reliance Provisions as to Lease Agreement and Guaranty**

Appellants additionally argue that "it cannot be genuinely disputed that" the disclaimer-of-reliance provisions relate "*at most*" to the Asset Sale and Purchase Contract and *not* to the lease agreement and the guaranty. Appellants point out that the disclaimer-of-reliance provisions are contained in only the asset purchase documents, that neither the lease agreement nor the guaranty has any disclaimer language similar to that found in the asset purchase documents, and that RWI, Series E and Pajooh were not parties to the Asset Sale and Purchase Contract. Because the disclaimer provisions do not apply to the lease agreement or the guaranty, and because Appellants pleaded and presented evidence of Appellees' fraud and misrepresentations in relation to the lease agreement and the guaranty, Appellants argue that the trial court erred by directing a verdict as to those claims, abused its discretion by refusing to submit jury questions as to those claims, and erred by disregarding the jury's finding that Pajooh's guaranty of the lease agreement was procured by fraud.

In directing a verdict and disregarding the jury's finding, the trial court implicitly concluded that the disclaimer provisions contained in the Asset Sale and Purchase Contract applied to the lease agreement and the guaranty. Appellants argued at the hearing on their motion for new trial that the disclaimer provisions did not relate to the lease agreement or the guaranty—the same argument that they raise on appeal—but the trial court declined to alter its ruling.

17

During the hearing on Appellees' motion to disregard the jury's finding, Appellees' counsel acknowledged that the guaranty does not contain any disclaimer-of-reliance language, but he argued that the disclaimers contained in the asset purchase documents applied to "everything," which would include the lease agreement and the guaranty. The argument was no model of clarity, but we understand what counsel meant.

In this and numerous other jurisdictions, there is a well-established line of authority "that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other." *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000); *see Veal v. Thomason*, 138 Tex. 341, 348, 159 S.W.2d 472, 475 (1942) ("It is the settled rule in this State, as well as the rule generally, that written contracts executed in different instruments whereby a single transaction or purpose is consummated are to be taken and construed together as one contract."). Moreover, "instruments may be construed together or treated as one contract even though they are not between the same parties." *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981). Consequently, "[i]n appropriate instances, courts may construe all the documents as if they were part of a single, unified instrument." *Fort Worth ISD*, 22 S.W.3d at 840.

Several cases are demonstrative. In one well-cited opinion, the Second Circuit held that the district court had properly construed together an asset

18

purchase agreement and a lease agreement—documents similar to those involved in this case. *See Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 52–53 (2nd Cir. 1993). The court reasoned,

> [T]he Asset Purchase Agreement relates to the assets and business that Slater sold to PSI, while the Lease involves PSI's rental from Slater of the Glen Cove and Elizabeth premises. However, the two transactions were intertwined. They were component parts of a single business transaction whereby PSI would purchase Slater's business and lease the premises from Slater on which to operate it. Each depended on the other; neither stood alone.

*Id.* at 53.

The Fifth Circuit used similar reasoning in determining whether an arbitration provision contained in one agreement applied to claims arising under a different agreement. *See Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 391–95 (5th Cir. 2002). Like Appellants' argument in this case, the appellant in *Motorola* argued that the arbitration provision contained in a product development agreement was inapplicable to its claims under a separate stock purchase agreement. *Id.* at 393. The Fifth Circuit disagreed:

> [T]he Stock Purchase Agreement and the Product Development Agreement were both key elements of a transaction in which Motorola agreed to provide financing in return for a stake in PSSI and access to PSSI's technology. Although the Stock Purchase Agreement and the Product Development Agreement govern different facets of the parties' relationship, the agreements must be construed together because they were executed at the same time as part of the same overall transaction.

*Id.*

19

Here, Pajooh and Shahbazi had originally agreed to swap Pajooh's 675 West Rankin property plus $200,000 for Shahbazi's Fort Worth convenience store, including the real property, but Pajooh was unable to acquire financing, so he purchased Shell on Western's assets, leased the property, and signed a personal guaranty. The Asset Sale and Purchase Contract, the lease agreement, and the guaranty were executed on the same day, at the same place, by the same two individuals (albeit on behalf of several different entities), and as part of a single business transaction. Indeed, the lease agreement provides that U.S. Capital may use the leased premises only for the "operation of [a] gas station and convenience store, Church's Chicken, and Car Wash." And the Asset Sale and Purchase Contract states that U.S. Capital desires to purchase all of the business assets located at "3605 Western Center, Fort Worth, Texas," which is the same property that U.S. Capital agreed to lease from RWI, Series E. Pajooh testified extensively about his negotiations with Shahbazi and agreed that he had relied upon Shahbazi's representations when entering into the "contracts" and that he would not have signed "anything" if he had been aware that the representations were not true. Pajooh thus described the overall process in terms of one transaction between him and Shahbazi, not three separate agreements. Like the courts in *Commander Oil* and *Motorola* treated the agreements in those cases, we are compelled under these circumstances to construe the Asset Sale and Purchase Contract, the lease agreement, and the

20

guaranty as if they are a single instrument. *See Fort Worth ISD*, 22 S.W.3d at 840.

We have already held that the disclaimer-of-reliance provisions are enforceable as to the Asset Sale and Purchase Contract. Because we construe that agreement along with the lease agreement and the guaranty, we hold that the disclaimer provisions are also enforceable against those agreements. Accordingly, Appellees negated as a matter of law the reliance element of Appellants' fraud and misrepresentation claims and affirmative defenses as they pertain to the Asset Sale and Purchase Contract, the lease agreement, and the guaranty. *See Schlumberger*, 959 S.W.2d at 181. The trial court did not err or abuse its discretion by granting a directed verdict, refusing to submit jury questions, and disregarding the jury's findings as to those claims and defenses. We overrule Appellants' first, second, and third issues.

## IV. ISSUES RELATED TO DAMAGES FINDING

### A. Defendant's Exhibit 78

In their fourth issue, Appellants argue that the trial court abused its discretion by admitting Defendant's Exhibit 78, a summary of Appellees' damages. Appellants objected that the documents attached to the summary—invoices and other documents establishing Appellees' damages—were inadmissible hearsay.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). The

21

erroneous admission of evidence requires reversal only if the error probably (though not necessarily) resulted in an improper judgment. Tex. R. App. P. 44.1.

Defendant's Exhibit 78 contains a summary of (i) the expenses that Shahbazi incurred for the numerous debts and fees that he paid and the repairs that he made upon retaking possession of the convenience store and (ii) the amounts due and owing under the lease agreement. To the extent that the summary was inadmissible because the documents attached to it were hearsay, the erroneous admission of the exhibit was harmless because Shahbazi provided his own testimony about much, if not all, of the same items and figures that are set out in Defendant's Exhibit 78. *See Owens-Corning Fiberglass Corp. v. Malone*, 916 S.W.2d 551, 559 (Tex. App.—Houston [1st Dist.] 1996) ("When erroneously admitted evidence is merely cumulative, any error in its admission is harmless."), *aff'd*, 972 S.W.2d 135 (Tex. 1998); *Welder v. Welder*, 794 S.W.2d 420, 430 (Tex. App.—Corpus Christi 1990, no writ) (holding that error in admitting summaries was harmless because they were cumulative of witness's testimony). We overrule Appellants' fourth issue.

## B. Evidentiary Sufficiency of Damages Finding

Appellants argue in their fifth issue that the evidence is legally and factually insufficient to support the jury's finding awarding RWI, Series E damages in the amount of $352,380 for U.S. Capital's failure to comply with the lease agreement.

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred

22

by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

As a general rule, the jury has broad discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for its

calculation. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). Shahbazi testified that Appellees sustained damages in the amount of $565,930 (1) due to U.S. Capital's failure to pay amounts due and owing under the lease agreement ($282,380) and (2) resulting from the debts and fees that he paid and repairs that he made after retaking possession of the convenience store ($283,550). Appellants take issue with a number of items that contribute to the $283,550 figure, arguing that some amounts are not evidence of damages, that some are amounts that RWI, Series E would have incurred irrespective of when U.S. Capital vacated the store, and that some amounts were merely for ordinary maintenance, but Appellants do not complain about Shahbazi's testimony that RWI, Series E sustained damages of over $282,000 for U.S. Capital's failure to pay all or some rent from February 2010 through January 2011, nor do they complain about Shahbazi's testimony that he was never paid $130,000 for the convenience store's inventory.[5] Those two figures alone (adding up to over $400,000) account for much more than what the jury actually awarded as damages. Applying the appropriate standards of review, we hold that the evidence is legally and factually sufficient to support the jury's damages finding. We overrule Appellants' fifth issue.

---

[5]Pajooh testified that he paid the $130,000 inventory debt by reducing the price by that same amount of yet another property that he sold to Shahbazi after the transaction on May 21, 2008, but the jury could have chosen to believe Shahbazi's testimony. *See City of Keller*, 168 S.W.3d at 819.

## V. CONCLUSION

Having overruled all of Appellants' issues, we affirm the trial court's judgment.[6]

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

DELIVERED:  May 1, 2014

---

[6]To the extent that Appellees make a request regarding conditional appellate attorneys' fees, the trial court's final judgment addresses that issue.